## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Ryan P. Dings and JoAnn N. Dings,** <br> **Plaintiffs** <br> **v.** <br> <br> **Gerard Lenhoff, Jr.** <br> **Defendant** | ) <br> ) <br> ) <br> ) <br> )     No. _____ <br> ) <br> ) <br> ) <br> ) <br> ) |

### COMPLAINT

Plaintiffs, Ryan P. Dings and JoAnn N. Dings, husband and wife, by and through their undersigned attorneys bring this Complaint against Defendant, Gerald Lenhoff and in support thereof avers as follows:

### NATURE OF THE ACTION

1.      This action seeks damages, including treble damages and attorneys fees, for violations of Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("UTPCPL"). 73 Pa. Stat. Ann. § 201-1 *et seq*. by Lenhoff in connection with the construction of a single-family home in Pequea Township, Lancaster County, Pennsylvania.

### PARTIES

2.      Plaintiffs, Ryan P. Dings and JoAnn N. Dings, husband and wife (hereinafter "the Dings") are adult individuals who reside at 8 Leaman Road, Lancaster, Pennsylvania. The Dings are citizens of Pennsylvania.

3.      Defendant Gerard Lenhoff, Jr. ("Lenhoff"), is an adult individual who resides at 600 E. Elkan Circle, Marco Island, Florida. Lenhoff is a citizen of Florida.

4.     At all relevant times Lenhoff was the sole owner, officer and director of Gerard

Builders, Inc. ("Gerard Builders") a Pennsylvania Corporation with its principal place of

business in Pennsylvania.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 because Plaintiffs and Lenhoff are citizens of different states and the amount in controversy

exceeds $75,000, exclusive of interest and costs.

6.     This Court has personal jurisdiction over Lenhoff because his acts and omissions

at issue in this case occurred in Pennsylvania, in this district, and he was a resident of

Pennsylvania and this district at that time.

7.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a) in that all of the

events, acts, or omissions giving rise to the Dings' claims occurred in this district.

## FACTUAL BACKGROUND

8.     On January 14, 2008, the Dings purchased from Five Springs Farm Limited

Partnership (hereinafter "the Developer") an unimproved lot designated as Lot 3 of the Five

Springs Farm Subdivision known and numbered as 8 Leaman Road, Pequea Township,

Lancaster County, Pennsylvania, Tax Parcel ID:  510-24359-0-0000 (hereinafter "the Property").

9.     The Property was part of the Final Land Development Plan for Five Springs Farm

Subdivision recorded in Subdivision Plan Book J-229, Page 73, in the Office of the Recorder of

Deeds in and for Lancaster County, Pennsylvania (hereafter the "Subdivision" or "Subdivision

Plan"). A true and correct copy of the Subdivision Plan is attached hereto and incorporated

herein as Exhibit "A."

10.    The Subdivision Plan was approved by Pequea Township as being compliant with

the Pequea Township Subdivision and Land Development Ordinance, the Pequea Township

Zoning Ordinance, the Pequea Township Stormwater Management Ordinance and other applicable Township and County ordinances and State and Federal statutes, regulations and mandates pertaining to the development of the Property.

11.    In accordance with the Pennsylvania Municipalities Planning Code, 53 P.S. §10101, et seq., Pequea Township held an Irrevocable Standby Letter of Credit in the amount of Two Hundred Seventeen Thousand Two Hundred Forty Six Dollars ($217,246) as security for the completion of certain site improvements to the Property and the three other lots within the Subdivision (hereinafter "LOC").

12.    Pursuant to the agreement for the sale of the Property, the Dings were obligated to pay One Hundred and Twenty Five Dollars ($125.00) per quarter to the Developer to maintain the LOC until the site improvements to the Property were completed and Pequea Township released the LOC.

13.    In or around January 2008, the Dings met with Mr. Lenhoff several times about building a single family dwelling on the Property and performing site improvements consistent with the Subdivision Plan.

14.    At the first meeting, the Dings went through the Subdivision Plans with Mr. Lenhoff page-by-page and discussed that the property was subject to a letter of credit insuring compliance with the Subdivision Plans. The Dings and Mr. Lenhoff specifically discussed that an infiltration pit was called for in the Subdivision Plans.

15.    Mr. Lenhoff told the Dings that "he had handled these [engineered subdivision plans] before," and that it was "not a big deal."

16.    Mr. Lenhoff also made the following assurances to the Dings regarding conformance with the Subdivision Plans:

      a.      "I will handle it."

      b.      "I will take care of it."

      c.      "Don't worry about it, we will take care of it."

17.    The Dings met with Mr. Lenhoff a second time to review Gerard Builder's proposal and to discuss the specifications for the home.

18.    At this meeting, the Dings specifically questioned Mr. Lenhoff about the infiltration pit, who stated that, "his people had checked on it and it was not necessary," and that, "in any event it was included in the line item for septic and seepage."

19.    At the second meeting, Mr. Lenhoff made the following assurances to the Dings regarding constructing the home in compliance with the Subdivision Plans:

      a.      "It's not a big deal, we've done this before."

      b.      "I will take care of it."

20.    When the Dings met with Mr. Lenhoff to sign the agreement for the construction of the home, Mr. Lenhoff made additional assurances that the home would comply with the Subdivision Plans stating, "I can handle the plans. It's no problem."

21.    Prior to entering into the Contract, Lenhoff assured the Dings that if they hired Gerard Builders, Gerard Builders would construct a single family dwelling on the Property and perform the site improvements in accordance with the Subdivision Plan.

22.    At the time of the Contract, Dings provided Lenhoff with a complete copy of the Subdivision Plan to utilize in the performance of the Contract.

23.    The Dings relied on Mr. Lenhoff's representations regarding compliance with the Subdivision Plans when they signed the contract.

24.     On March 21, 2008, the Dings entered into a written contract with Gerard Builders pursuant to which Gerard Builders agreed to construct a single family dwelling on the Property "in compliance with the applicable building code and other governing regulations" in exchange for Three Hundred Sixty Thousand Eight Hundred Sixteen Dollars ($360,816.00)" (hereinafter "the Contract"). A true and correct copy of the Contract is attached hereto and incorporated herein as Exhibit "B."

25.     On or about April 29, 2008, Jeff Brubaker ("Brubaker"), an employee of Gerard Builders submitted an Application for a Building/Zoning Permit to Pequea Township (hereinafter "Permit Application"). A true and correct copy of the Permit Application is attached hereto and incorporated herein as Exhibit "C."

26.     The Permit Application provided that Gerard Builders "bears all responsibility for insuring compliance with all applicable laws and regulations during and at completion of the work authorized by this permit, including but not limited to compliance with the Township Stormwater Management Ordinance, the Lancaster County Subdivision and Land Development Ordinance, Uniform Construction Code, and Property Maintenance Codes."

27.     On May 5, 2008, Gerard Builders was issued a building permit by Pequea Township based upon its Permit Application (hereinafter the "Permit"). A true and correct copy of the Permit is attached hereto and incorporated herein as Exhibit "D."

28.     Upon information and belief, after receiving the Permit, Lenhoff told Brubaker to stake out the location of the dwelling.

29.     Lenhoff failed to give Brubaker a copy of the Subdivision Plan.

30.     Brubaker set the location of the dwelling and set the elevation of the dwelling without the benefit of the Subdivision Plan.

31.     Gerard Builders and its subcontractors began construction of the dwelling prior to the installation of the underground utilities, inlet, and infiltration pit in violation of the construction sequence set forth in the Subdivision Plan.

32.     The Subdivision Plan contemplated the dwelling on the Property having a first floor elevation of 396.00 feet and a garage floor elevation of 395.33 feet.

33.     Without the Dings' knowledge or permission, Lenhoff and Gerard Builders deviated from the approved Subdivision Plan and set the first floor elevation of the dwelling on the Property at 394.18 feet and the garage floor at 392.78 feet (see Exhibit "E").

34.     Gerard Builders set the first floor elevation 1.82 feet lower than the elevation set forth in the Subdivision Plan and set the elevation of the garage floor 2.55 feet lower than the elevation set forth in the Subdivision Plan.

35.     Neither Lenhoff nor Gerard Builders sought approval from Pequea Township before deviating from the approved Subdivision Plan.

36.     Due to the elevation change of the dwelling, the storm water management system detailed in the approved Subdivision Plan could not be constructed as set forth in the Subdivision Plan.

37.     Due to the elevation change of the dwelling, Lenhoff and Gerard Builders significantly altered the storm water management system set forth in the approved Subdivision Plan including the grading of the Property and the installation of a drainage swale and infiltration bed.

38.     As a result of the elevation change of the dwelling and the alterations to the storm water management system, water does not properly drain away from the foundation walls and likely caused cracks to develop in the foundation walls due to settlement.

39.    As a result of the elevation change of the dwelling and the alterations to the storm water management system the Dings' basement floods periodically.

40.    As a result of the elevation change of the dwelling, the basement windows are below finished grade.

41.    In or around December 2008, the Dings again asked Mr. Lenhoff about the need for an infiltration pit and were told that it was not necessary.

42.    Throughout the construction of the home, the Dings relied on Mr. Lenhoff's representations that the home as built would conform to the Subdivision Plans.

43.    At no time during the construction of the home, even after issues arose, did Mr. Lenhoff state that the home would not conform to the Subdivision Plans.

44.    The Dings did not become aware that Lenhoff and Gerard Builders changed the elevation of the dwelling until May 3, 2010 when they received a field survey report prepared by Lake Roeder Hillard & Associates, a copy of which is attached hereto as Exhibit "E."

45.    On November 26, 2008, prior to completing its obligations under the Contract, Gerard Builders demanded and received final payment in the amount of Nine Thousand Seventy Two and 15/100 Dollars ($9,072.15) and has, to date, received the total Contract amount of Three Hundred Sixty Thousand Eight Hundred Sixteen Dollars ($360,816.00).

46.    Approximately ten months after Gerard Builders was paid in full, it installed the infiltration pit required by the Contract in a location that did not comply with the Contract and/or the Subdivision Plan.

47.    Approximately ten months after Gerard Builders was paid in full, it installed a storm swale that does not comply with the Subdivision Plan and does not comply with the Pequea Township Stormwater Management Ordinance.

48.     Mr. Lenhoff personally assumed responsibility for ensuring that the construction of the Dings' home conformed to the Subdivision Plans and other applicable laws.

49.     Lenhoff, despite repeated demands, has refused to complete his obligations under the Contract and refused to correct the defective work.

50.     Lenhoff and Gerard Builders represented to the Dings' lender (SunTrust Mortgage), and Pequea Township that the Contract was completed and the dwelling ready for occupancy in November of 2008 when it applied for and received a Temporary Certificate of Use and Occupancy ("TCO").

51.     Gerard Builders did not complete the installation of the septic system until approximately ten months after it received the TCO. During those ten months the septic tanks periodically overflowed and untreated sewage flowed onto the Property.

52.     As a result of the Lenhoff's failure to ensure the Home as constructed complied with all applicable laws, ordinances and regulations the Dings have or will suffer the following damages:

      (a)    $147,561.00 to lift the dwelling to the proper elevation so as to prevent the period flooding of the lower level of the dwelling and to comply with the Pequea Township Stormwater Management Ordinance;

      (b)    $7,000.00 for temporary lodging while the dwelling is being lifted;

      (c)    $1,000.00 to seal the sanitary sewer line;

      (d)    $6,000.00 to remove and replace improperly installed basement window wells; and

      (e)    $400.00 to supply and install a sump pump.

53.     The Dings obtained an appraisal to determine whether the defects noted above affected the value of the Property. Based on a real estate appraisal completed on December 23,

2010, the diminution in value to the Dings' real estate caused by Gerard Builders' deficient work is One Hundred Seventy Seven Thousand and 00/100 Dollars ($177,000.00).

54.     To date, the Dings have also incurred engineering and surveying expenses to identify the deficiencies in the construction of the Home.

55.     Between January 2008 and March 21, 2008 Lenhoff repeatedly assured the Dings that Gerard Builders would construct a single family dwelling on the Property and perform the site improvements in accordance with the Subdivision Plan.

56.     The representations made by Lenhoff were material to the Dings' decision to enter into the contract with Gerard Builders.

57.     The Dings relied on the representations of Lenhoff.

58.     The representations made by Lenhoff were untrue.

## COUNT I
### Violation of the Unfair Trade Practices and Consumer Protection Act, 73 Pa. C. S. A. S 201-1. et seq.

59.     The Dings incorporate herein by reference the averments of the previous paragraphs as if set forth fully herein.

60.     Mr. Lenhoff is personally liable to Plaintiffs pursuant to, *inter alia*, *Bennett v. A.T. Masterpiece Homes at Broadsprings LLC*, 40 A.3d 145, 150 (Pa. 2012), holding that personal guarantees of performance by the owner of a company establishes personal liability under the Pennsylvania Unfair Trade Practice and Consumer Protection Law ("UTPCPL"). 73 Pa. Stat. Ann. § 201-1 *et seq*.

61.     Mr. Lenhoff is the sole owner and officer of Defendant Gerard Builders.

62.     Mr. Lenhoff personally assured the Dings on numerous occasions that if they hired Gerard Builders, that Gerard Builders and Mr. Lenhoff would construct a single family dwelling and perform all site improvements in accordance with the Subdivision Plans.

63.     At a meeting in the Dings' home in January 2008, the Dings discussed with Mr. Lenhoff constructing a single family dwelling on the Property and performing site improvements in accordance with the Subdivision Plan.

64.     At this meeting, the Dings went through the Subdivision Plans with Mr. Lenhoff page-by-page and discussed that the property was subject to a letter of credit insuring compliance with the Subdivision Plans. The Dings and Mr. Lenhoff specifically discussed that an infiltration pit was called for in the Subdivision Plans.

65.     Mr. Lenhoff told the Dings that "he had handled these (engineered subdivision plans) before," and that it was "not a big deal."

66.     Mr. Lenhoff also made the following assurances to the Dings regarding conformance with the Subdivision Plans:

      a.     "I will handle it."

      b.     "I will take care of it."

      c.     "Don't worry about it, we will take care of it."

67.     The Dings met with Mr. Lenhoff a second time to review Gerard's proposal and to discuss the specifications of the home.

68.     At this meeting, the Dings specifically questioned Mr. Lenhoff about the infiltration pit who stated that, "his people had checked on it and it was not necessary," and that, "in any event it was included in the line item for septic and seepage."

69.     At the second meeting, Mr. Lenhoff made the following assurances to the Dings regarding conformance with the Subdivision Plans:

a.      "Its not a big deal, we've done this before."

b.      "I will take care of it."

70.     When the Dings met with Mr. Lenhoff to sign the agreement for the construction of the home, Mr. Lenhoff made additional assurances that the home would comply with the Subdivision Plans stating, "I can handle the plans. It's no problem."

71.     The Dings relied on Mr. Lenhoff's representations regarding compliance with the Subdivision Plans when they signed the contract.

72.     In or around December 2008, the Dings again asked Mr. Lenhoff about the need for an infiltration pit and were told that it was not necessary.

73.     Throughout the construction of the home, the Dings relied on Mr. Lenhoff's representations that the home would conform to the Subdivision Plans.

74.     At no time during the construction of the home, even after issues arose, did Mr. Lenhoff state that the home would not conform to the Subdivision Plans.

75.     Mr. Lenhoff's failure to comply with the Subdivision Plans resulted in building deficiencies, including but not limited to, reduced elevation of the home and improperly installed site improvements, causing excess water to flow into the Dings' home and compromised the foundation of the home.

76.     In February 2009, the Dings contacted Mr. Lenhoff about the stormwater infiltration pit for their home after being informed by Stuart Herr that the infiltration pit was in fact required by the Subdivision Plans.

77.     On April 4, 2009, Mr. Lenhoff met with the Dings at the property and admitted to them that he had missed the infiltration pit on the plans for their home.

78.     As a result of this meeting Lenhoff agreed to install an infiltration pit and complete other work called for by the Subdivision Plan related to stormwater management.

79.     In or around April 2009, Mr. Lenhoff also had Wes Bruckno, Pequea Township's then Zoning Officer, come to the site to "approve" the location of the infiltration pit that Lenhoff installed. Mr. Lenhoff however knew or should have known that Wes Bruckno lacked the authority to approve these changes.

80.     In or about August or September of 2009, Mr. Lenhoff caused an infiltration pit to be installed at the Property in a location that did not comply with the Contract and/or the Subdivision Plan and also caused a storm swale to be installed that does not comply with the Subdivision Plan and does not comply with the Pequea Township Stormwater Management Ordinance.

81.     Accordingly, Mr. Lenhoff personally assumed responsibility for ensuring the construction work on the Property conformed to the Subdivision Plans and may be held liable for damages as a party to this action.

82.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. C. S. A. §201-1, et seq. (hereafter "UTPCPL") applies to the Contract between the Dings and Mr. Lenhoff because it was a contract for the construction of a home to be used for personal and family purposes.

83.     Mr. Lenhoff's conduct constituted unfair or deceptive acts or practices and is therefore unlawful under the UTPCPL because:

(a)     Mr. Lenhoff represented that the services to be provided would comply with the Subdivision Plans and other applicable governing regulations. 73 Pa. C. S. A. §201-2(4)(vii);

(b)     Mr. Lenhoff failed to comply with the terms of the written guarantees and warranties given to the Dings, prior to and after the Contract was made despite his personal assurances. 73 Pa. C. S. A. §201-2(4)(xiv);

(c)     Mr. Lenhoff made improvements to the Dings' real property of a nature or quality inferior to or below the standard of that agreed to in the Contract. 73 Pa. C. S. A. §201-2(4)(xvi); and

(d)     Mr. Lenhoff engaged in other fraudulent or deceptive conduct designed to confuse the Dings and create misunderstanding regarding the construction of the Dings' home and compliance with the Subdivision Plans and other applicable governing regulations. 73 Pa. C. S. A. §201-2(4)(xxi).

84.     As a result of Mr. Lenhoff's violation of the UTPCPL, the Dings have suffered damages in excess of Two Hundred Twenty One Thousand Seven Hundred Seventy One and 48/100 Dollars ($221,771.48).

85.     Under Section 201-9.2 of the UTPCPL, the Dings are entitled to up to three times the actual damages which amounts to a figure in excess of Six Hundred Sixty Five Thousand Three Hundred Fourteen and 44/100 Dollars ($665,314.44).

86.     Under Section 201-9.2 of the UTPCPL, the Dings are entitled recover costs and reasonable attorneys' fees.

87.     All conditions precedent for the bringing of this action have occurred and/or have been performed.

WHEREFORE, Plaintiffs, Ryan P. Dings and JoAnn N. Dings respectfully request this

Honorable Court enter judgment in their favor and against Defendant, Gerard Lenhoff, Jr. on

Count I of their Complaint for treble damages in excess of $665,314.44, plus costs, interest and

attorneys' fees and such other relief as the Court deems appropriate.

Respectfully submitted,

**THORP REED & ARMSTRONG, LLP**

BY: 

Christopher M. Brubaker, Esquire
Pa. Attorney I.D. 82057
**Attorneys for Ryan P. Dings and
JoAnn M. Dings**
One Commerce Square
2005 Market Street, Suite 1910
Philadelphia, PA 19103
215.640.8500

Dated: August 10, 2012          215.640.8501 (fax)

# EXHIBIT "A"













POST CONSTRUCTION STORMWATER MANAGEMENT PLAN





















PRESSURE DISTRIBUTION AT-GRADE SEEPAGE BED

PRESSURE DISTRIBUTION ELEVATED SAND MOUND BED (0 TO 5% EXISTING GRADE SLOPE)



POST CONSTRUCTION STORMWATER MANAGEMENT PLAN



POST CONSTRUCTION STORMWATER MANAGEMENT PLAN

# EXHIBIT "B"

GERARD BUILDERS, INC

# CONSTRUCTION/BUILDING AGREEMENT

THIS AGREEMENT is made this 21st day of March, 2008, by and among Gerard Builders, Inc. ("BUILDER") and Ryan P. Dings and JoAnn N. Dings ("OWNER").

Intending to be legally bound hereby, BUILDER and OWNER agree as follows:

1.   Dwelling. BUILDER shall erect and complete construction of a single family dwelling on the OWNERS' lot, located on Lesman Rd, Lancaster, Pennsylvania, 17603, in a substantial and professional manner under the terms of this Agreement ("Dwelling"). The Dwelling shall be constructed as a Gerard Builders "G" Model home, (Modified in accordance with the attached drawings) and according to the Specifications dated March 21, 2008, which are included herein by reference. The Dwelling shall be constructed in compliance with the applicable building code and other governing regulations. BUILDER shall provide all labor, materials, and equipment required for construction of the Dwelling. Additionally, BUILDER shall procure and pay for all building, occupancy, water, sewer, and power company connections, permits or fees, as applicable and detailed in Specifications.

2.   Construction Commencement. BUILDER shall begin construction of the Dwelling on or before April 30, 2008, pursue completion of construction in a prompt and diligent manner, and complete the Dwelling in approximately 180 days (the "Substantial Completion Date"). However, the Substantial Completion Date shall be extended if (a) BUILDER'S progress is delayed by OWNER'S requests for Change Orders or OWNER'S failure to approve Change Orders promptly, or (b) unforeseen conditions, extra work, strikes, or acts of God are encountered.

3.   Stipulation against Liens. BUILDER shall execute a Stipulation against Liens in connection with this Agreement, which shall be recorded in the office of the Prothonotary of Lancaster County before BUILDER commences any work.

4.   Insurance. OWNER shall maintain in full force and effect, during construction and up to the time of settlement, hazard insurance, for the real property upon which the Dwelling will be built for the full insurable value of the work thereon, and liability coverage in an amount satisfactory to BUILDER (the "Insurance Policy"). The Insurance Policy shall insure the BUILDER, OWNER, and OWNER'S lender as their interests may appear. BUILDER shall maintain all insurance as required by law for a project of this type. All subcontractors of BUILDER shall be insured.

5.   Safety. To ensure the safety of the OWNER, BUILDER requires all visits to the Dwelling site by the OWNER, their guests or agents to be made during normal business hours. The OWNER is required to make an appointment with and be accompanied by the BUILDER'S job site supervisor. Any such visits shall be made at the OWNER'S, guests' or agents' own risk. Visitors shall observe all applicable safety rules while on site.

6.   Cooperation with OWNER'S lender. BUILDER will furnish to OWNER'S lender drawings and Specifications for the Dwelling. BUILDER shall permit and facilitate inspection of the work during normal business hours by the OWNER, their agents, public authorities and the lender.

7. **Unforeseen Conditions.** If BUILDER encounters rock, quicksand, sinkholes, water springs, unknown underground utilities or any other unusual conditions during the course of construction of the Dwelling (collectively the "Unforeseen Conditions") and BUILDER must remedy the Unforeseen Conditions using labor and/or materials not contemplated at the time of this Agreement or included in the contract price, then OWNER shall compensate BUILDER additionally for said work on a time and materials basis. Builder will obtain approval of such work and the related costs from the OWNER before remedying these conditions. Additionally, BUILDER shall not be responsible for the remediation or mitigation of any environmental conditions, including, but not limited to, the presence of radon gas, unless said work is set forth in the Specifications.

8. **Change Orders.** Any changes in the work originally contemplated by the drawings and Specifications prepared and completed contemporaneously with the execution of the Agreement, (each change a "Change Order") shall be made in writing (each a "Change Order Form"). Change Order Forms must be executed by the OWNER and BUILDER (in the time period requested by the BUILDER), and **Change Order charges must be paid at the time of execution** or during the time allowed for by the Change Order (5 calendar days), all of which shall occur prior to the ordering of materials or performance of additional work proposed by the Change Order. Executed Change Order Forms shall be amendments to this Agreement, the Specifications, and the drawings.

9. **Payments for Construction Services.** OWNER agrees to pay BUILDER the sum of Three Hundred Sixty Thousand Eight Hundred Sixteen ($360,816.00) Dollars, as full compensation for the Dwelling and the parcel upon which it will be constructed. Payments shall be made in accordance with a schedule (the "Draw Schedule") either provided or approved by the BUILDER, at the BUILDER'S discretion. The OWNER agrees to and hereby does authorize the Lender to make ALL payments under the Draw Schedule directly to the BUILDER, upon BUILDER'S request and without the need of further authorization, including a pay out authorization ("POA"), from the OWNER. All payments to the BUILDER shall be made within 10 days of any invoice date. Late payments may be charged interest at the rate of one (1%) percent per month. The OWNER shall not be permitted to take possession of and/or occupy the Dwelling in whole or in part (even for storage purposes) until after final settlement or payment to BUILDER of the full contract amount plus any additional costs under Change Orders.

10. **Warranty.** BUILDER shall provide a limited one-year warranty for any defects in materials and workmanship in the Dwelling. This warranty will become effective beginning when the BUILDER grants possession of the property to the OWNER and continue for one year from this date. This date will be communicated in writing from the BUILDER to the OWNER. The OWNER must make any claim under this warranty in writing within one year of Substantial Completion of the Dwelling. All equipment, appliances, special systems and similar items are provided with only the manufacturers' warranties and guarantees, and BUILDER shall not warrant them. BUILDER shall not be liable for or warrant any work contracted for directly with third parties by the OWNER or performed by the OWNER.

11. **Assignment.** Neither BUILDER nor the OWNER shall assign or otherwise transfer any rights or interest under this Agreement without the prior, written consent of the other.

12. **Termination.** This Agreement may not be terminated except upon the failure of either party to cure default in performance hereunder within ten (10) days of receipt of written notice thereof or as mutually agreed in writing by both OWNER and BUILDER.

13.     **Conflicts.** If a conflict arises between the specifications and the construction drawings for this project, the information on the Gerard Builders drawings shall govern. Signed change orders shall supersede the signed plans and specifications.

14.     **Entire Agreement.** This Agreement contains the whole agreement between the BUILDER and the OWNER. No other terms, obligations, covenants, representations, statements , or conditions, oral or otherwise, of any kind whatsoever are part of this contract.

The Parties have caused this Agreement to be executed the day and year written above.

Gerard Builders, Inc.                                    Owner(s)

_____                    _____

                                                             John Noty

JUN-06-2008 09:55 AM   GERARD LENHOFF
05/28/2008  06:02   71776  88

717 786 4511          P.02
CROUSE' BODY           PAGE 01/01

**GERARD BUILDERS, INC**

# AMENDMENT

### TO

# CONSTRUCTION/BUILDING AGREEMENT

THIS AGREEMENT is made this 27th day of May, 2008, by and among Gerard Builders, Inc. ("BUILDER") and Ryan P. Dings and JoAnn N. Dings ("OWNER").

Intending to be legally bound hereby, BUILDER and OWNER agree as follows:

Construction Commencement. BUILDER shall begin construction of the Dwelling on or before June 30, 2008, pursue completion of construction in a prompt and diligent manner, and complete the Dwelling in approximately 180 days (the "Substantial Completion Date"). However, the Substantial Completion Date shall be extended if (a) BUILDER'S progress is delayed by OWNER'S requests for Change Orders or OWNER'S failure to approve Change Orders promptly, or (b) unforeseen conditions, extra work, strikes, or acts of God are encountered.

The Parties have caused this Agreement to be executed the day and year written above.

Gerard Builders, Inc.

Gerard Lenhoff

Owner(s)

Ryan P. Dings

JoAnn N. Dings

**Gerard Builders, Inc.**

◆◆◆

Post Office Box 301
New Providence, PA 17560
◆
Phone 717-786-7994
Fax 717-786-4511

SPECIFICATIONS

| Client/Owner: | Ryan & JoAnn Dings |
|---|---|
| Phone Numbers: | Home: (717) 618-0501; Mobile: (717) 689-0597 (JoAnn); Mobile: (717) 572-9766 (Ryan) |
| Mailing Address: | 454 Groffdale Rd., Quarryville, PA 17566 |
| Subject Property Location: | Leaman Rd., Lancaster, PA 17603 |
| Date: | March 21, 2008 |
| Referenced Documents: | |
| Job Scope: | Construct a Gerard Builders "G" Model home on Owners' lot |

PERMITS

Procure and pay for all building, occupancy, and driveway permits, township inspection fees (**Allowance: $2,100.00**) and water, sewer, and power company wire and connection fees (connection points to be most convenient location as determined by utility provider), limited to normal distance of 75-100' and barring any special requirements by the utility company (i.e., transformers, special studies, etc.).

PLOT PLAN

Prepare a plan showing the approximate location of the house in accordance with township set-back ordinances.

☑ Design and plotting of septic system in accordance with Sewage Enforcement Officer ordinances.

EXCAVATION

Remove and replace top soil.

Excavate and backfill basement and footings.

☑ Borrowing or removal from site of any top soil or fill shall be done at an extra cost.

☑ Trimming of existing trees except for construction purposes and trees that are dead or die after excavation are the Owner's responsibility.

☑ Cutting of trees, removal and burial of stumps on site. **Allowance: N/A**

☑ Grading beyond areas disturbed by construction shall be done at an extra cost.

Builder shall attempt to protect and save all trees designated by Owner, but any special provisions to do so, such as retaining walls or wells, shall be at the Owner's expense. **Allowance: N/A**

☑ Install septic system in accordance with above design. **Allowance: $7,500.00**

1

## CONCRETE

Footings:

Furnish and install a minimum of 2500 PSI ready-mixed concrete for footings as Required by 2006 IRC Building Code.

Footings shall be a minimum of 18" wide and 8" deep.

Install 4" perforated plastic piping around interior perimeter of basement footings for future radon mitigation, if necessary.

Walls:

Basement walls shall be poured concrete, 8" thick and a minimum of 3000 PSI.

☐ 8' walls              ☑ 9' walls

Garage walls shall be 8" poured concrete, 3' high minimum.

Provide 36" minimum frost protection for all foundation walls.

Slabs:

Garage and basement slabs shall be a minimum of 3000 PSI.

Provide reinforcing in the garage floors and other areas as deemed necessary by contractor.

☑ Sump pump pit         ☑ 10' x 25' concrete patio

Walks:

Walks from front porch to driveway shall be concrete 36" wide and approximately 4" thick.

☐ Walks from front porch to driveway, shall be 42" wide and approximately 4" thick.

☐ Stamped concrete       ☐ Exposed aggregate
☐ Brick

## MOISTURE PROTECTION

Install 4" perforated plastic drain tile around exterior perimeter of foundation.

Spray one coat of Deco 20 or equal as required by 2006 IRC Building Code.

☑ Sump pump provided during one-year warranty period only if necessary.

## FRAMING AND LUMBER

Sill plates shall be 2" x 6" treated lumber with sill foam.

All floor joists shall be 2" x 10" Hemlock Fir 16" OC.

☐ TJI system

Joist hangers shall be used where necessary.

Sub-flooring shall be 3/4" tongue and groove OSB, glued and screwed.

Exterior and bearing wall studs shall be 2" x 6" kiln-dried Spruce 16" OC.

Interior framing shall be 2" x 4" kiln-dried Spruce 16" OC.

☐ 8' first floor wall heights
☑ 9' first floor wall heights
☐ Other _____

2

Owners' Initials _____

**FRAMING AND LUMBER (CONTINUED)**

☑ Tray ceilings _Dining room – same as model (TN35)_

☑ Arches __6__ as per drawings

Roof framing shall be pre-engineered trusses or hand framed, as deemed necessary by Builder.

☐ Cathedral ceilings _____

☐ Vaulted ceilings _____

☐ Barrel ceilings _____

☑ Two-story ceilings _Family room_____

Roof sheathing, including gable trusses, shall be 7/16" OSB. Gable trusses shall be covered with Tyvek®.

All other wall sheathing shall be Zip System Wall.

**ROOFING**

Install 15# felt over roof sheathing.

Install shingled roof vents for proper air circulation.

Install Dimensional 30-year fiberglass roof shingles selected from Builder's standard colors.

☐ Other _____

**GUTTERS AND DOWNSPOUTS**

Install aluminum gutters and downspouts selected from Builder's standard colors.

**WINDOWS AND EXTERIOR DOORS**

Windows shall be vinyl-clad, double-hung tilt, or as per drawings.

Windows shall be low-E, with grids between the glass.

Screens are included.

Front door shall be 3' pre-hung, fiberglass unit.

☐ 6-panel

☑ Other _ThermaTru CCR205 or equal_

Door from house to garage shall be pre-hung 2' 8" Continental masonite fire door.

All other exterior doors as per drawings.

☐ 9-lite _____          ☐ 15-lite _____

**SIDING, FASCIA, SOFFIT AND SHUTTERS**

Siding (on rear elevation only) shall be vinyl, Dutch Lap 4 1/2" selected from Builder's standard colors.

☐ Beaded

☐ Cedar

☐ Other _____

Fascia shall be aluminum selected from Builder's standard colors.

· 3                                            Owners' Initials _____

### SIDING, FASCIA, SOFFIT AND SHUTTERS (CONTINUED)

Soffit shall be vented aluminum selected from Builder's standard colors.

Shutters shall be selected from Builder's standard colors.

    ☑ Vinyl—board and batten      ☐ Cedar

### MASONRY

Furnish and install stucco wrap on the wall sheathing behind all masonry work.

Stucco or an equal material shall be applied to exterior surfaces as shown on the drawings.

Stucco color shall be selected from manufacturer's standard samples.

    ☑ Stucco including labor and sales tax. **Allowance: $7.50/sq. ft.**
      **On front elevation, where specified and on both side elevations**

    ☑ Brick including labor and sales tax. **Allowance: $9.00/sq. ft.**

    ☑ Manufactured stone including labor and sales tax.
      **Allowance: $14.00/sq. ft.**
      **On front elevation, where specified and 3' water table on both side elevations**

Any special mortar colors, joint treatment, pulled corners, arches, or precast lintels not shown on the drawings but later requested, shall be charged to the Owner on a time and material basis.

### HVAC

Install a complete high efficiency heating unit and 13 SEER air conditioning unit in accordance with 2006 IRC Building Code and manufacturer's specifications.

    ☑ Heat pump      ☐ Oil (direct vent, high efficiency)

    ☐ Propane      with (1) 275 gal. vertical tuff tank

### PLUMBING

Install a complete plumbing system in accordance with 2006 IRC Building Code using fixtures checked below.

| | | |
|---|---|---|
| ☑ | 4' x 3' tile shower | 1 (master) |
| ☑ | Builder's standard shower faucet | 1 (master) |
| ☑ | Body jet system (Allowance:$2,000 incl. install.)1 (master) | |
| ☑ | Builder's standard 4" cc lavatory faucet | 2 (master) |
| ☑ | Builder's standard round toilet | 1 (master) |
| ☑ | Toilet seat/cover | 1 (master) |
| ☑ | Builder's standard 5' tub/shower | 1 (main) |
| ☑ | Builder's standard tub/shower faucet | 1 (main) |
| ☑ | Builder's standard 4" cc lavatory faucet (per drawings) | 2 (main) |
| ☑ | Builder's standard round toilet | 1 (main) |
| ☑ | Toilet seat/cover | 1 (main) |
| ☑ | Builder's standard 4" cc lavatory faucet | 1 (powder) |

4

Owners' Initials: JMJ  R.PD

## PLUMBING (CONTINUED)

| | | |
|---|---|---|
| ☑ | Builder's standard 4" cc pedestal sink | 1 (powder) |
| ☑ | Builder's standard round toilet | 1 (powder) |
| ☑ | Toilet seat/cover | 1 (powder) |
| ☑ | Builder's std chrome faucet w/spray | 1 (kitchen) |
| ☑ | Standard double-bowl stainless steel sink | 1 (kitchen) |
| ☑ | Stainless steel strainers | 2 (kitchen) |
| ☑ | Builder's standard laundry sink | 1 (laundry) |
| ☑ | Builder's standard laundry faucet | 1 (laundry) |
| ☑ | Builder's standard electric water heater—80 gal. | 1 |
| ☑ | Rough-in for basement bath | 1 |
| ☑ | Well including drilling, piping, pump and wiring. Allowance: $4,000.00 | |
| ☐ | Other _____ | |
| ☐ | See options page | |

Standard fixture colors: white, silk, or natural.

All other colors and bath fixtures shall be supplied at an extra cost.

Ice maker line is included.

Two exterior hose bibs are included.

Install piping stud for future connection to radon vent fan, if necessary.

All plumbing fixtures shall be supplied by Gerard Builders (no exceptions).

### ELECTRICAL

Service size: 200 amp; breaker-type service

Electrician will locate electrical panel box in location best suited for efficiency. Wiring for washer, dryer, range, dishwasher, water heater, bath fans, post light, keyless fixtures, heating/cooling systems, garage door opener and whirlpool (if applicable) is included. All bedrooms pre-wired for ceiling fans.

Install receptacles in accordance with 2006 IRC Building Code.

Install one receptacle at panel box.

Install smoke detectors in accordance with 2006 IRC Building Code.

| | | | |
|---|---|---|---|
| Install two outdoor receptacles. | ☐ | Other | _____ |
| Install five cable television jacks. | ☐ | Other | _____ |
| Install five telephone jacks. | ☐ | Other | _____ |
| Install five recessed lights in kitchen. | ☐ | Other | _____ |
| Install one ceiling fan in family room. | ☐ | Other | _____ |

| | | |
|---|---|---|
| ☐ | Under-cabinet lighting | Allowance: N/A |
| ☑ | Cordless window candles – roughed-in, front windows only | |
| ☐ | Intercom system | Allowance: N/A |

5

Owners' Initials: _JM_ _RPD_

ELECTRICAL (CONTINUED)

☐ Install wiring for surround sound.                                    Allowance: N/A
☐ Central vacuum system   ☐ rough ☐ finished                          Allowance: N/A
☐ Security system          ☐ rough ☐ finished                          Allowance: N/A
☐ Audio system             ☐ rough ☐ finished                          Allowance: N/A
☐ Satellite system rough-in                                            Allowance: N/A
☐ Other _____

All lighting fixtures shall be supplied by Gerard Builders (no exceptions).
Allowance: $3,000.00

FIREPLACE

Install Heat N Glo direct vent 36" 550 series fireplace.

☑ Heatilator direct vent 42" Model CD4236 in corner of family room;
   drywall across corner from mantle to ceiling.

Tile surround approximately 5' high with wood mantle and flush 12" wide slate hearth.

☐ Brick surround              ☐ Raised hearth

☑ Stone surround             ☐ Brick hearth

☐ Stone/brick surround       ☐ Other _____

INSULATION

Provide sound insulation around all bathrooms and laundry room.

Firecaulk all penetrations per 2006 IRC Building Code.

Caulk all double studs and floor plates.

Use minimal expanding foam around windows.

Exterior wall insulation to be 6" R-19, paper-faced insulation.

Ceiling insulation to be R-38, blown-in or R-30 batted insulation where applicable.

Basement ceiling: R-11 batted.

Garage walls: R-19 batted.

Garage ceiling: R-30 batted.

DRYWALL

Drywall shall be installed on all interior house and garage walls and ceilings.

1/2" drywall shall be installed on all interior house walls, finished with rounded corners
and painted.

5/8" drywall shall be installed on all interior house and garage walls, finished and ready to paint.

☑ Tray ceiling           location: _Dining room – same as model_
☑ Rounded corners        location: _Throughout_
☑ Arches                 location: _Per drawings_
☐ Barrel arches          location: _____
☑ 2-story ceiling        location: _Family room_

6                                        Owners' Initial: _MB_ _RPD_

### GARAGE DOORS

Install one 16' x 7' raised-panel, steel, insulated garage door, with one automatic operator and two remote control units.

| | | |
|---|---|---|
| ☐ | Stockton I | Quantity: _____ |
| ☐ | Other _____ | Quantity: _____ |
| ☑ | 9' x 7' door | Quantity: __3__ |
| ☐ | 16' x 7' door | Quantity: _____ |
| ☐ | Automatic openers | Quantity: _____ |
| ☑ | Remote control unit | Quantity: __6__ |

### MILLWORK

Interior trim material shall be paint-grade White Pine.

Install standard 3 1/4" base molding and standard 2 1/4" casing throughout the home.

Install wood sills for all double-hung and casement windows.

| | | |
|---|---|---|
| ☐ | Crown molding | location: _____ |
| ☐ | Chair rail | location: _____ |
| ☐ | Wainscoting | location: _____ |
| ☑ | Upgraded trim package | location: __Throughout_____ |
| ☐ | Window seat | location: _____ |
| ☐ | Bench | location: _____ |

Interior doors shall be Masonite Continental style.

| | | |
|---|---|---|
| ☐ | Solid core | ☐ Provincial |
| ☐ | Semi-solid core | ☐ Camden |
| ☐ | Wood | ☐ Other _____ |

Stairways shall be boxed stairs, paint-grade Yellow Pine risers, stringers and treads.

| | | |
|---|---|---|
| ☐ | Oak | ☐ Stain grade risers |
| ☐ | Maple | ☐ Stain grade stringers |
| ☐ | Cherry | ☐ Stain grade treads |
| ☐ | Other _____ | |

Balusters shall be paint-grade Poplar.

☑ **Wrought Iron (wrought iron balusters and Beech railing to be installed at arched opening at top of stairs also, in lieu of half wall) Allowance: $1,025.00**

Banisters shall be finger-jointed, stain-grade Beech.

| | | |
|---|---|---|
| ☐ | Oak | ☐ Cherry |
| ☐ | Maple | ☐ Other _____ |

Exterior trim material shall be paint-grade Cedar.

Owners' Initials _____ _____

**FINISH HARDWARE**

Interior doors shall be fitted with Schlage Georgian Series hardware in **Satin Nickel**

Passage sets: Model F110

Privacy sets: Model F40

Dummy sets: Model F170

Exterior front door shall be fitted with Schlage Plymouth Series F360 lock set with Deadbolt in **Satin Nickel**

Other exterior doors shall be fitted with Schlage Georgian Series F51 lock sets in **Satin Nickel**

☐ Other finish: _____

☐ Other style: _____

☐ Hinge finish: _____

**PAINT**

Walls and ceilings shall be painted with flat latex paint.

Trim shall be painted with one coat of primer and one coat of semi-gloss acrylic latex paint.

One color of paint for both the walls and ceilings and one like color of paint for the trim are permitted in the price of the home.

Additional colors for walls, ceilings or trim shall be provided for an extra cost.

Any finish other than flat latex on walls and ceilings shall be provided for an extra cost.

☑ Other _Family room and foyer walls to be painted a second color; family_

_room and foyer ceilings to be painted white_ _____

_____

One coat of stain and two clear coats shall be applied to banister and mantle top.

Colors may be selected from Builder's standard colors.

Builder will provide a one-time touch up after all finishes are complete.

Painting of registers, switch and receptacle covers or cabinets is not included.

The durability of exterior paint is not covered under warranty.

**SHELVING AND BATH ACCESSORIES**

Wire shelving shall be installed in all bedroom closets and laundry room(1 shelf each).

Wire shelving shall be installed in linen closets (4 shelves each).

Wire shelving shall be installed in pantry (4 shelves).

☐ Other _____

Master bath shall be fitted with one chrome towel bar, one chrome toilet paper holder and one custom shower door. Allowance: $1,500.00 (shower door)

☐ Finish: _____     ☐ Other: _____

8                                                    Owners' Initials _____

**SHELVING AND BATH ACCESSORIES (CONTINUED)**

Master bath shall have ___1___ mirror 36" high x width of vanity.

Main bath shall be fitted with one chrome towel bar, one chrome toilet paper holder and one shower curtain rod.

   ☐ Finish: _____ ☐ Other: _____

Main bath shall have one mirror 36" high x width of vanity.

Powder room shall be fitted with one chrome towel bar and one chrome toilet paper holder.

   ☐ Finish: _____ ☐ Other: _____

**FLOORING**

Carpet: material and labor

Location: _Family room, living room, stairs, 2nd floor hallway, all bedrooms_

Vinyl: material and labor

Location: _Main bathroom, kitchen, breakfast area, laundry_

Hardwood floor

Location: _Foyer, dining room, powder room_

Ceramic tile

Location: _Master bathroom shower and floor_

All flooring shall be supplied by Gerard Builders (no exceptions).
**Allowance: $14,000.00**

**CABINETRY**

Install *Showplace* (or equal) kitchen and vanity cabinets; kitchen counter tops to be granite, vanity tops to be cultured marble.

   ☐ Corian    ☑ Granite – Level 1

   ☐ Marble    ☐ Other _____

   **Allowance: $25,000.00**

The kitchen designer shall verify the approximate layout of the kitchen cabinets and appliances.

Any built-ins, such as wet bar or bookcases, shall be billed at an extra cost unless otherwise specified.

All cabinetry and tops shall be supplied by Gerard Builders (no exceptions).

**APPLIANCES**

Package includes:
  Slide-in range, dishwasher, microwave drawer, refrigerator.
  **Allowance: $6,000.00**

Any downdraft cooktops must have specific venting, the cost of which shall be the responsibility of the Owner. Hook-up of washer and dryer shall be the responsibility of the Owner.

All appliances shall be supplied by Gerard Builders (no exceptions).

9            Owners' initials _____

**DRIVEWAY PAVING**

Install crushed stone for driveway with 2" minimum asphalt paving.

Length and width shall be dictated by lot and house placement.

☐ Standard turnaround for side-load garage approximately 17' x 30'

**Allowance: $2,800.00**

**LANDSCAPE AND SEEDING**

Landscape planting shall be Builder's standard package.

Seeding using contractor's blend shall be done of disturbed areas only.

Boulders, landscape timbers and retaining walls shall be installed at an extra cost.

Spraying for weeds and poison ivy, if requested, shall be done at an extra cost.

**Allowance: $4,000.00**

**CLEANING**

Home will be "broom clean" at closing/delivery.

**OPTIONS**

Many design and product options are available. Builder will furnish Owner with cost for options, if requested.

**OTHER**

_____

_____

_____

_____

_____

_____

**NOTE**

If a conflict arises between these specifications and the contract drawings for this project, the information on the drawing shall govern.

GERARD BUILDERS INC                    OWNER(S)

Owners' Initials _____

10

# EXHIBIT "C"

## PEQUEA TOWNSHIP
1028 MILLWOOD ROAD
WILLOW STREET, PA 17584
☎ (717) 464-2322
🖷 (717) 464-4098
✎ pequeatw@comcast.net ✎

# APPLICATION FOR A BUILDING/ZONING PERMIT

| ☞ Please Include the Following: | For Township Use: |
|---|---|
| ✓ **Application fee** - see calculation on p. 3<br>✓ **Three sets of building plans**<br>✓ **Stormwater management plan** (if adding more than 500 square feet of new impervious area)<br>✓ **Plot plan** showing lot lines and new construction<br>✓ **Driveway** permit application (if new driveway)<br>✓ Proof of **workman's compensation** insurance<br>✓ **Sewage** disposal permit (if new dwelling)<br>✓ **Residential disclosure** statement (if new dwelling)<br>✓ SCS-approved **Erosion and Sedimentation Control** plan if necessary<br>✓ See additional notes on page 4.<br><br>☞ Select **building inspector** from page 3.<br><br>⇨ **Sign** the application on p. 2 | Received:<br><br>Rec. 4-29-08<br><br>CK#15360  $404 ᵗᵒ<br><br>Approved: Permit Number_____<br><br>Denied: Section_____ |

| Please allow 15 days for processing! |
|---|

1.  Applicant's name: _GERARD BUILDERS, INC_

2.  Applicant's address: _P O BOX 501_
    _NEW PROVIDENCE, PA. 17560_

3.  Applicant's telephone: (day) _717 786 2994_    (after-hours) _629 3774_

4.  Owner's Name and Signature: _Dings_
    (I authorize the applicant to make this application)

5.  Owner's Address: _8 Leaman Rd Gane 17603_

6.  Address and location of worksite: _FIVE SPRINGS FARM DEVELOPMENT_
    _LOT #3_

7.    What is being proposed by this application?: _BUILD  NEW  HOME_

8.    Contractor: _G-ERALD  BuILDER_ contractor's phone number: _786 7994_

9.    Cost (market value): $ _200,000_  10.   Square feet of new construction: _3000_

11.   Workman's Insurance carrier: _EASTERN  ALLIANCE  INS  Co._

## AUTHORIZATIONS AND NOTIFICATIONS:

The issuance of a building or zoning permit is based on the information and representations made in this application. A permit may be revoked if the use and/or the structure for which it has been issued violates any applicable Township, County, State or Federal law or regulation or if it has been issued in error or if it has been issued based on any misrepresentation or substantial errors contained in the application or otherwise made by the applicant.

Pequea Township ("the Township") does not guarantee or give opinions relating to the adequacy of any proposed construction or design related to this permit and does not warrant compliance with any law or regulation by the issuance of this permit. The applicant bears all responsibility for insuring compliance with all applicable laws and regulations during and at completion of the work authorized by this permit, including but not limited to compliance with the Township Stormwater Management Ordinance, the Lancaster County Subdivision and Land Development Ordinance, Uniform Construction Code, and Property Maintenance Codes. The applicant acknowledges that he has not relied upon any oral or written statements of any Township officials in making this application. The applicant is aware that he cannot begin excavation or construction or change the use of the property until a permit has been issued by the Township.

The applicant authorizes the Township to investigate, inspect, and examine the property described herein, including land and structures, and all supporting plans and designs, to determine compliance with the Township Zoning Ordinance, building codes and other applicable laws and regulations, and to determine the accuracy of the statements contained herein. The applicant shall be responsible for paying inspection and review fees charged by Township inspectors. The applicant acknowledges that the Township requires that a final inspection may be performed and that a Certificate of Use and Occupancy may be required to be issued prior to occupancy or use of the structure or land use that is the subject of this application. It is the applicant's responsibility to insure that applicable inspections are scheduled. The applicant acknowledges that, if the structure is occupied or used prior to the final inspection and issuance of a Certificate of Use and Occupancy, that work may need to be removed and reconstructed in order that an adequate inspection may be performed. If the Township is required to perform such an additional inspection, additional inspection fees may be charged.

Nothing in this application shall be construed to relieve or limit the obligations of the applicant to comply with all applicable provisions of the Township Zoning Ordinance and other applicable Township laws and regulations, or to limit the ability of the Township to act against violations of the Zoning Ordinance or other applicable Township laws and regulations.

By signing this application, the applicant certifies that all facts in the application and all accompanying documentation become part of this application and that all such materials are true and correct. This application is being made by the applicant to induce official action on the part of the Township, and the applicant understands that any false statements made herein may be subject to penalties relating to unsworn falsification to authorities.

APPLICANT'S SIGNATURE _____ / _GERALD BUILDERS_
                                                Date: _____

*Please allow 15 days for processing!*

2

**TOWNSHIP REVIEW FEES:** Two, separate review fees will be charged by the Township and the Building Inspector. Fees paid to Pequea Township are as follows:

| Township Fee Schedule | |
|---|---|
| Fair market value of new construction: | Fee paid to the Township: |
| $0.00 - $5000 | $25.00 |
| $5001 - $50,000 | $25.00 plus $1.50 for each $1000 or part thereof over $5001 |
| $50,001 - $100,000 | $100 plus $1.50 for each $1000 or part thereof over $50,001 |
| $100,001 - and over | $175 plus $2.00 for each $1000 pr part thereof over $100,001 |
| At-grade decks, patios, signs, fences, detached garages without utilities, garden sheds, and non-habitable agricultural structures | $25.00 |
| Add $4.00 State-mandated surcharge to all applications | |

**BUILDING INSPECTOR REVIEW FEES:** The selected building inspector will charge fees according to his schedule. Contact the inspector for his fee schedule.

### List of Authorized Building Inspectors

Only these inspectors are authorized to perform official inspections in relation to the issuance of a permit pursuant to this application. These inspectors will charge a review fee in addition to the Township fee. Building inspector fees shall be paid by the applicant directly to the building inspector.

☐ Commonwealth Code Inspection Service, Inc. 176 Doe Run Road, Manheim, PA 17545. Contact Peter Schilling, 717-664-2347

☐ Building Code Inspections, LLC. P.O. Box 10482, Lancaster, PA 17605. Contact Robert W. Osborne, 717-330-3378

**Please call Township Codes Officer Wes Bruckno with any questions at
717-464-2322
*Please allow 15 days for processing!***

3

## ADDITIONAL PERMITS AND APPROVALS WHICH MAY BE REQUIRED PRIOR TO ISSUANCE OF A UNIFORM CONSTRUCTION CODE PERMIT:

☞ Zoning Permit under the Zoning Ordinance.

☞ Proof of recording of a subdivision and/or a land development plan for all non-residential construction and for construction of any dwelling not on a separate lot of record.

☞ PennDOT Highway Occupancy Permit if the property fronts on a highway under the jurisdiction of the Pennsylvania Department of Transportation and a new access or modified access is required.

☞ Driveway access permit if the property fronts on a Township street and any street openings are required for the installation of underground utilities.

☞ Permit to connect to and/or expand the use of the public water system or the public sewer system if either or both system(s) will be used or the proposed construction will result in an expansion of such use.

☞ On-lot sewage disposal system permit (where public sewer service is not available) if sewage disposal is required or the proposed construction will result in expansion of the number of bedrooms in a dwelling.

☞ Erosion and sedimentation control plan approval from the County Conservation District.

☞ Stormwater management plan approval by the Township.

☞ Proof of variance, special exception or conditional use approval.

4

# EXHIBIT "D"

# ZONING AND BUILDING PERMIT No. 3772

# PEQUEA TOWNSHIP

## Lancaster County, Penna.

The Supervisors of Pequea Township in accordance to an ordinance adopted the 18th day of July, 1969, and as amended hereby issue this permit to

Applicant **GERARD BUILDERS INC**

Location **LOT 3 FIVE SPRINGS FARM**

For **SINGLE FAMILY DWELLING**

Date **5.5.08**                                        _____
                                                              Zoning/Codes Officer

● This sign must be posted during Construction at a location visible to traveling public, and should be protected from rain, snow, etc.

# EXHIBIT "E"



Lake Roeder Hillard & Associates

313 W. Liberty St., Suite 1
Lancaster, PA 17603
(717) 397-9037
Fax (717) 397-9098
www.LRHA.com

May 3, 2010

Mr. Ryan Dings
8 Leaman Road
Lancaster, PA 17603

RE:    Lot 3
       Five Springs Farm Subdivision
       Leaman Road
       Pequea Township

Office Locations:
Lancaster
Oxford
Thorndale
Campbelltown
New Holland
Coatesville
Reading

Dear Mr. Dings;

On May 1, 2010, Lake Roeder Hillard & Associates performed a field survey to determine the first floor elevation of the existing dwelling on Lot 3 of the Five Springs Farm Subdivision. The Benchmark as shown on the plans (a PK Nail in Leaman Road) was recovered as part of the survey. The elevation of the Benchmark is 373.20.

This letter certifies that the first floor elevation of the dwelling is 394.18. The garage floor elevation is 392.78.

Sincerely,

LAKE ROEDER HILLARD & ASSOCIATES

David C. Garman, PLS

DAVID C. GARMAN